OPINION OF THE COURT
Bonnie G. Wittner, J.
Defendant, Nue Nikollaj, was convicted by a jury on February 7, 1991 of the crimes of attempted aggravated assault on a police officer, criminal possession of a weapon in the second degree, and two counts of discrimination.
*643 He moves pursuant to CPL article 440, to set aside the judgment on the ground, inter alla, that the People failed to turn over to defense counsel at trial various Rosario and Brady material.
The record on the motion consists of the evidence at trial and the testimony and exhibits admitted during the CPL article 440 hearing, which was completed on June 30, 1992. The court appreciates the excellent submissions of both sides.
THE TRIAL
Defendant’s convictions arose out of a shooting incident that occurred on January 20, 1989 at approximately 12:20 p.m. in the vicinity of 2420 Bronx Park East. The People’s case consisted primarily of the identification testimony of the two complainants, Police Officer James Ward and his brother Jerry Ward, and circumstantial evidence linking the defendant to the yellow Toyota involved in the shooting. Both James and Jerry Ward testified that on the date in question they were en route to Jerry’s apartment at 2420 Bronx Park East, when they noticed a yellow Toyota occupied by three white males. These men were honking the car’s horn and making obscene gestures at the Wards. The Wards tried to ignore them and eventually attempted to make a U-turn in order to park their car. The Toyota pulled up perpendicular to the Wards’ car and blocked the U-turn. The front passenger, whom both Wards identified as the defendant, then displayed a gun. Police Officer Ward left his vehicle, identified himself as a police officer, and told the Toyota’s driver to turn off the ignition. A struggle ensued between Police Officer Ward and the front passenger and the officer fired two or three shots. Jerry Ward, who had also exited the car, dropped to the ground behind his brother’s vehicle and stayed there until the yellow car drove off. The passenger in the yellow car and Police Officer Ward exchanged further gunfire as the Toyota sped northbound. The car was recovered in Riverdale several days later and traced to the defendant. Nue Nikollaj was identified from a lineup as the passenger in the yellow car. Although James Ward is a police officer in the Bronx, the lineup fillers were Bronx policemen as well.
ROSARIO VIOLATIONS
The defendant contends that the People committed error by failing to turn over to the defense various documents which contained statements made by numerous prosecution trial *644 witnesses. (People v Rosario, 9 NY2d 286 [1961], cert denied 368 US 866; CPL 240.45 [1] [a].)[1]
He argues that these violations per se require vacatur of the conviction and a new trial without regard to prejudice. Specifically, he asserts that where, as here, the defendant has not exhausted his direct appeal, the applicable standard on CPL article 440 motions is the "per se” error rule and not the prejudice standard recently enunciated by the Court of Appeals in People v Jackson (78 NY2d 638 [1991]) and People v Bin Wahad (79 NY2d 787 [1991]). Additionally, defendant maintains that even under the prejudice standard, the omissions of fact and details and the variations and inconsistencies among the materials provided and those withheld are sufficient to warrant a new trial. (See, People v Young, 79 NY2d 365 [1992]; People v Consolazio, 40 NY2d 446 [1976], cert denied 433 US 914.)
The People urge that their failure to timely disclose the documents in question does not merit vacatur of the conviction. They concede that certain documents were not turned over to the defense at trial and that some of these documents constitute Rosario material. According to the People, these items, however, are the "duplicative equivalent” of other, previously surrendered Rosario material and therefore need not have been disclosed. The People also assert that, even if the materials are not duplicative equivalents, in the context of a CPL article 440 motion, a Rosario violation is not per se reversible error. Rather, in order to prevail, the defendant must "demonstrate a reasonable possibility that the failure to disclose the Rosario material contributed to the verdict.” (People v Jackson, supra, at 649; People v Bin Wahad, supra, at 789.)
The Rosario rule, first enunciated by the Court of Appeals in People v Rosario (9 NY2d 286 [1961], cert denied 386 US 866, supra) and now codified in CPL 240.45 (1) (a), imposes an affirmative duty upon the prosecution to provide the defense with all pretrial statements of prosecution witnesses that relate to the subject matter of the witness’ testimony. In Rosario, the Court held that, "[e]yen statements seemingly in harmony with [trial] testimony may contain matter which will *645 prove helpful on cross-examination * * * [therefore,] [a]s long as the statement relates to the subject matter of the witness’ testimony and contains nothing that must be kept confidential, defense counsel should be allowed to determine for themselves the use to be made of it on cross-examination.” (Supra, at 289.)
This strong presumption of discoverability is based on the deeply rooted belief that a defendant must be afforded a fair opportunity to cross-examine the prosecution’s witnesses. Thus, as the Rosario Court concluded, "a right sense of justice entitles the defense to examine a witness’ prior statement, whether or not it varies from [the witness’] testimony on the stand” (People v Rosario, supra, at 289), and "[regardless of] the manner in which [the statement] is recorded.” (People v Consolazio, 40 NY2d 446, 453 [1976], supra.) "The essence of the Rosario requirement [is a firm recognition that] a judge’s impartial determination as to what [documents] may be useful to the defense, is no substitute for the single-minded devotion of counsel for the accused” who is more motivated and better equipped to assess its usefulness. (People v Perez, 65 NY2d 154, 160 [1985].) Accordingly, "a failure to turn over Rosario material may not be excused on the ground that such material would have been of limited or of no use to the defense.” (People v Consolazio, supra, at 454.)
The Consolazio Court, however, did recognize a narrow exception to the Rosario rule by exempting material that is the "duplicative equivalent” of previously disclosed material. Consolazio (supra) involved undisclosed prosecutor’s worksheets containing statements of a trial witness. The Consolazio Court found that the undisclosed statements were the "equivalent duplication” of statements made by this witness before the Grand Jury. Accordingly, the failure to turn over the worksheets did not violate Rosario. (Supra, at 454.)[2]
Recently in People v Young (79 NY2d 365, supra), the Court of Appeals discussed the duplicative equivalent exception to the Rosario rule, emphasizing that since "there continues to be a 'strong presumption of * * * discoverability’ ” (supra, at 369, citing People v Ranghelle, 69 NY2d 56, 63) the exception must be narrowly circumscribed. The Young Court, citing Consolazio (supra), reiterated that: "[t]wo documents cannot be *646 'duplicative equivalents’ if there are variations or inconsistencies between them * * * Further, '[statements are not the "duplicative equivalent” of previously produced statements * * * just because they are "harmonious” or "consistent” with them’ * * * Indeed, a statement that is consistent with other disclosed material but omits details or facts cannot be considered the 'duplicative equivalent’ of the disclosed material.” (People v Young, supra, at 370.) In Young, the undisclosed material consisted of an unusual occurrence report (U.O.R.) addendum to a police report. The U.O.R. contained facts not mentioned in previously disclosed material and also omitted several details contained in other reports. Consequently, the Court held that it did not qualify as a duplicative equivalent.
The Appellate Division has also refined the duplicative equivalent exception to the Rosario rule. In People v Robinson (133 AD2d 859 [2d Dept 1987]), the prosecution argued that handwritten notes of an interview of a trial witness were the duplicative equivalent of another, timely disclosed, statement. The Robinson Court disagreed: "if a witness makes substantially the same statement on two separate occasions, and each statement is recorded, then each statement should be considered [nonduplicative] Rosario material.” (Supra, at 861 [emphasis added]; see also, People v Rivera, 170 AD2d 544 [2d Dept 1992] [complaint follow-up report (DD5) is not the duplicative equivalent of the criminal complaint, on-line booking sheet, or the witness’ Grand Jury testimony since DD5 contained some details not found in the other material, and contradicted or omitted other details contained in that material].)
Here, it is undisputed that the People failed to provide the defense, prior to the verdict, with the following materials, all of which clearly constitute Rosario material:
(1) a 16-minute tape-recorded interview of Police Officer Ward, July 21, 1989;
(2) a 38-minute tape-recorded interview of seven police officers who responded to the crime scene and took statements from both Wards, January 20, 1989;
(3) a one-page statement of Jerry Ward memorialized in a borough investigative report, undated;
(4) a two-page letter from Captain Hudson, Commanding Officer, 49th Precinct, to the Chief of the Police Department, detailing an interview of James Ward by Captain Hudson, July 21, 1989;
*647 (5) two police firearm discharge assault reports, undated;
(6) the memo book entry of Sargeant Kroon, 49th Precinct, January 20, 1989;
(7) a two-page crime scene unit report, January 20,1989.
The court has compared the undisclosed material to the
materials the People rely on as duplicates and finds that the seven withheld documents are not duplicative equivalents.
(A) The 16-minute tape-recorded interview of Police Officer Ward.
It is hard to fathom how a 16-minute taped interview of the principal witness can under any circumstances be considered a duplicative equivalent of anything other than, possibly, a word-for-word transcription. (See, People v Robinson, supra, 133 AD2d, at 861; cf., People v Mahones, 136 AD2d 745 [2d Dept 1988], lv denied 71 NY2d 899 [prosecutor’s failure to turn over police complaint report did not constitute Rosario error where statement contained in the complaint report was word-for-word transcription of a statement contained in a previously disclosed document].)
To summarize the recorded interview: Police Officer Ward states that he and his brother were coming from an auto parts store when they "noticed a yellow vehicle honking its horn.” When Ward tried to make a U-turn to park his car, the driver of the yellow car pulled up and said, "What’s up nigger.” The officer replied, "nothing” and continued making the turn, at which point "[t]he driver pulled up again, cut his wheel * * * blocked my car.” This time, the yellow car’s passenger said, "Hey, what’s up nigger” and pulled out a handgun, pointing it at Police Officer Ward and his brother.
Police Officer Ward got out of his car and said, "I’m a police officer, turn the car off.” He then went to the front passenger side and identified himself a second time, displaying his shield and gun. Police Officer Ward said that as he approached, the passenger was in the process of putting his gun away. Ward grabbed the passenger’s arm and directed the driver to turn off the car, repeating that he was a police officer. Instead, the driver put the car in reverse and started to back up, and the passenger turned his gun towards Police Officer Ward who pushed it away. The passenger then pointed it towards Police Officer Ward’s face and the officer fired his revolver three or four times. As the car pulled away, the passenger fired two shots, shattering the windshield, and Police Officer Ward fired one last shot as the vehicle fled.
*648 The prosecution claims this taped interview need not have been disclosed because it duplicates other police reports and Police Officer Ward’s Grand Jury testimony, all of which had been timely disclosed. A brief review of that material highlighting some of the omissions and contradictions between the reports and the taped interview is appended hereto.
(B) The 38-minute tape-recorded interview of seven officers who responded to the scene and interviewed the Wards.
In this interview, the seven officers who responded to the scene each recounted the statements made by Police Officer Ward. The People have submitted DD5 No. 14 and allege that it is the duplicative equivalent of the tape-recorded interview. While DD5 No. 14 is a synopsis of the interview, it is not a word-for-word transcription and omits many of the facts and details found in A-21. Thus, it is not a duplicative equivalent and the failure to disclose it violated the Rosario rule. (Cf., People v Mahones, supra [word-for-word transcription is duplicative equivalent].)
It is clear to me that there are numerous inconsistencies and outright contradictions with respect to information contained in each of the remaining withheld documents and their alleged duplicative equivalents. Accordingly, the failure to turn over these documents was a Rosario violation.
The issue before me now becomes whether a Rosario violation raised in a CPL article 440 motion brought before the defendant has exhausted his direct appeal, is per se reversible error, or alternatively, must the defendant show prejudice in order to receive a new trial.
The Court of Appeals has repeatedly held that a Rosario violation raised on direct appeal is per se reversible error. In People v Consolazio (40 NY2d 446, supra), the Court specifically rejected the application of a "harmless error” analysis to such violations. Rather, the Consolazio Court held that a failure to turn over Rosario material, whether inadvertent or not, entitles the defendant to a new trial.
Recently, in People v Jackson (78 NY2d 638 [1991], supra), the Court considered whether the per se error rule applies to Rosario claims made by way of a postjudgment motion, after defendant has exhausted his appeals. In a four-to-three decision, the Jackson Court held that the per se error rule should be applied "up until the completion of the appellate process.” (Supra, at 648.) Thereafter, should the defendant seek to set aside a conviction by way of a CPL article 440 motion brought *649 after exhaustion of the appeals process, the defendant must show a reasonable possibility that the failure to disclose the Rosario material contributed to the verdict. (Supra, at 649.)
The opinion does not specifically discuss CPL article 440 motions brought immediately after judgment, prior to any appeal. Logic dictates, however, that a per se standard apply since to require a showing of prejudice at this stage would force the trial court to deny the motion on the very grounds upon which the appellate court must reverse as per se error. (See, People v Jackson, supra, at 657 [dissent by Titone, J.];[3] but see, People v Robles, 153 Misc 2d 859 [1992] [all defendants raising Rosario claims pursuant to a motion to vacate a judgment must show prejudice, whether or not a direct appeal has been exhausted].)
Accordingly, the defendant in this case need not establish that he was prejudiced by the failure to turn over the Rosario material.
Finally, even if an actual showing of prejudice were required, the defendant has overwhelmingly established such prejudice here. This is not a case where one or two documents were withheld. Rather, the defendant did not receive a voluminous amount of Rosario material either before or during trial. Plainly, he was prejudiced by the omission of facts and details and the variations and inconsistencies among the materials provided and those withheld. (See, discussion of duplicative equivalents, at 647-648, supra.) To reiterate, it is hard to conceive of how the withholding of a 16-minute recorded interview of the main eyewitness, Police Officer James Ward, could not have adversely affected the defense’s case. Clearly there exists a reasonable possibility that the Rosario violations contributed to the verdict.
In sum, I find that the Rosario violations committed in this case require a new trial.
[Portions of opinion omitted for purposes of publication.]
APPENDIX
(i) Five-Page Report dated January 20, 1989 from the Com *650 manding Officer, 49th Precinct to the Chief of the Department, People’s Hearing Exhibit 2:
According to People’s Hearing Exhibit 2, Police Officer Ward described the driver and front passenger as white males, 20 to 25 years old. In Defendant’s Hearing Exhibit A-20, he gave no physical description of any of the car’s occupants.
People’s Hearing Exhibit 2 indicates Police Officer Ward reported that when the Toyota pulled alongside him, its occupants yelled, "What’s up nigger, what are you niggers doing in this neighborhood.” In Defendant’s Hearing Exhibit A-20, however, Ward makes no mention of the second part of that statement.
According to People’s Hearing Exhibit 2, Police Officer Ward first saw the passenger’s gun when he looked inside the yellow car while standing at the driver’s window. Ward also said that he first displayed his shield and identified himself as a police officer when approaching the passenger side of the yellow car. In contrast, in Defendant’s Hearing Exhibit A-20, Ward claimed to have seen the other gun when he was still seated in his car, and claimed, too, that his shield was displayed and he identified himself as a police officer upon leaving his car.
As a final example of the discrepancies, People’s Hearing Exhibit 2 reflects that "P.O. Ward fired the remaining two or three shots at the fleeing Toyota * * * [T]he rear window of the Toyota was shattered”. This contradicts the taped interview in which Police Officer Ward stated that the passenger of the yellow vehicle shattered the rear window.
(ii) Complaint Report, People’s Hearing Exhibit 3:
The complaint report contains descriptions of the three perpetrators allegedly given by the Wards. As Police Officer Ward gave no physical description in A-20, these documents are not duplicative equivalents.
(iii) DD5 No. 11, People’s Hearing Exhibit 4:
This police report contains a description of the perpetrator and Police Officer Ward’s statement that both the "rear window and the right rear passenger window were broken in the exchange of gun fire.” Again, in his taped interview, Ward gave no physical description, nor did he mention that the rear passenger window was shattered.
(iv) DD5 No. 14, Trial Hearing Exhibit 5:
*651 In this report, the sequence of shots fired contradicts the version contained in the taped interview. In Defendant’s Hearing Exhibit A-20, Police Officer Ward said he fired first, the passenger shot back and Police Officer Ward fired again. In contrast, in DD5 No. 14 Police Officer Ward is reported as saying that the front passenger fired first and Police Officer Ward then returned fire and shot out the yellow car’s rear window.
A further discrepancy is Police Officer Ward’s statement in DD5 No. 14 that one of the perpetrators shouted "Nigger don’t make a U-turn here”. No such statement is contained in A-20.
(v) On-Line Booking Sheet, People’s Hearing Exhibit 6A:
This report omitted many of the facts and details given in the taped interview. It is therefore not a duplicative equivalent of that interview.
(vi) On-Line Booking Sheet, People’s Hearing Exhibit 6B:
This document indicates the Wards described the shooter as having a mustache and straight hair of normal length. Again, there is no description whatever in Defendant’s Hearing Exhibit A-20.
(vii) Aided Report, People’s Hearing Exhibit 7:
This document omits many of the details found in A-20.
(viii) Prosecutor’s Worksheet, People’s Hearing Exhibit 8:
This document contains many inconsistencies and also omits many of the details found in Defendant’s Hearing Exhibit A-20.
(ix) Forensic Report Run, People’s Hearing Exhibit 15:
According to this report, Police Officer Ward said that upon approaching the perpetrator’s car and identifying himself as a police officer he noticed one of the passengers in possession of a weapon, that the perpetrators fired first and only then did Police Officer Ward discharge his weapon. In contrast, in Defendant’s Hearing Exhibit A-20, Police Officer Ward says that he saw a gun while he was still seated in his vehicle and that he fired the first shot.
(x) The Grand Jury Testimony:
Police Officer Ward’s Grand Jury testimony is a generally less detailed account of the events and also contains information different than that in A-20.

. Defendant does not allege any intentional misconduct on the part of the Assistant District Attorney. He argues, however, that whether the trial prosecutor was aware of the documents’ existence is irrelevant since the prosecutor is responsible, pursuant to People v Rosario (supra), for the Police Department’s failure to provide the material.

. The prosecution bears the burden of proving that the undisclosed statements are duplicative equivalents. (People v Ray, 140 AD2d 380 [2d Dept 1988].)

. The dissent in Jackson (supra) maintained that the majority’s holding would lead to unequal and unfair administration of the Rosario rule. According to the dissent, the holding ran afoul of the very essence of Rosario, i.e., mandatory disclosure, and would encourage prosecutors to postpone disclosure of belatedly discovered material until after sentencing.